BRYAN, Judge,
dissenting.

Undisputed Facts

The following facts are undisputed. In 2005, Mobile Attic, Inc., and Mobile Attic Franchising, Inc. (collectively “MA”), which rent portable storage facilities, began discussing with TotalCom, Inc. (“TC”), an advertising agency, the possibility of having professional television commercials produced for MA. MA was represented in those discussions by Betsy Harris, the marketing director for MA; TC was represented in those discussions by Jimmy Warren, TC’s president. Following the initial discussions between Harris and Warren, Warren, in March 2005, sent Harris a written proposal containing estimates from three production companies of the cost for producing a set of three commercials for MA. TC’s written proposal stated that those “[ejstimates include all anticipated costs for television production: concepts, story boards, writing, models, props, sets, shooting, production, site expenses, and editing.” (Emphasis added.) After considering the estimates, MA selected Dill Productions (“Dill”) as the production company to produce the commercials, and Harris, on September 26, 2005, sent Warren an e-mail telling him to proceed with the production of the commercials using Dill as the production company. TC and MA did not prepare and sign a written contract memorializing the terms of their agreement. TC subsequently sent MA an invoice dated October 6, 2005, billing MA for “ ½ of production costs to produce” the three commercials and an invoice dated November 11, 2005, billing MA for the “[f]inal ½ of production costs to produce” the three commercials. MA paid TC’s October 6, 2005, and November 11, 2005, invoices in full. On March 16, 2007, approximately a year after MA first started airing the commercials, Warren sent Harris an e-mail requesting that MA pay talent-renewal fees for the professional actors used in the commercials.[3] MA did not pay the talent-renewal fees.

Procedural History

MA sued TC and one of the talent agencies claiming the talent-renewal fees, seeking a judgment declaring that it was not obligated to pay the talent-renewal fees and that, if any talent-renewal fees were owed, they were owed by TC. MA also stated a claim of fraudulent suppression against TC and sought a jury trial with respect to that claim. Two other talent agencies claiming talent-renewal fees intervened. Subsequently, all three talent agencies asserted counterclaims against MA, seeking $21,000 in talent-renewal fees. The trial court ordered a separate jury trial for MA’s fraudulent-suppression claim and held a bench trial regarding MA’s claim seeking a declaratory judgment and the talent agencies’ counterclaims seeking $21,000 in talent-renewal fees. Following the bench trial, the trial court entered a judgment declaring that MA was obligated to pay the talent-renewal fees and awarding the talent agencies $21,000 in talent-renewal fees. The trial court did not make any express findings of fact.
MA then appealed. Because the trial court’s judgment did not dispose of MA’s fraudulent-suppression claim and the trial court had not certified the judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P., we reinvested the trial court *49 with jurisdiction to determine whether to certify the judgment as a final judgment pursuant to Rule 54(b), and the trial court eventually certified it as a final judgment pursuant to Rule 54(b).

Disputed Evidence

Warren testified that, in a meeting after he sent Harris the written proposal in March 2005 and before Harris sent him her September 26, 2005, e-mail telling him to proceed with the production of the commercials, he told Harris that MA would be responsible for paying talent-renewal fees and that Harris made no response. Harris testified that she had no recollection of Warren ever mentioning that MA would be responsible for paying talent-renewal fees before she received his March 16, 2007, email asking TC to pay the talent-renewal fees and that she would not have agreed to the production of the commercials if she had heard Warren say that MA would be responsible for paying the talent-renewal fees.

Analysis

MA argues, among other things, that the trial court erred in declaring that MA is obligated to pay the talent-renewal fees because, MA says, there was no mutual assent by MA and TC that MA would be responsible for the talent-renewal fees. I agree. Because TC and MA did not prepare and sign a written contract memorializing the terms of their agreement, we must determine whether they mutually assented that MA would be obligated to pay the talent-renewal fees on the basis of their conduct. See Lilley v. Gonzales, 417 So.2d 161, 163 (Ala.1982).
The written proposal TC sent MA in March 2005 expressly stated that the “[e]s-timates include all anticipated costs for television production: concepts, story boards, writing, models, props, sets, shooting, production, site expenses, and editing.” (Emphasis added.) There was no mention of talent-renewal fees in the proposal. Moreover, the October 6, 2005, invoice TC sent MA billed MA for “ ½ of production costs to produce” the three commercials and the November 11, 2005, invoice TC sent MA billed MA for the “[fjinal ½ of production costs to produce” the three commercials. It is undisputed that MA paid both those invoices in full. Neither of those invoices referred to any future amounts MA would owe, and, indeed, the November 11, 2005, invoice stated that it represented the “final ” half of the costs to produce the commercials, which indicated that MA would not owe any further amount. Although Warren testified that he mentioned to Harris that MA would be obligated to pay talent-renewal fees in a meeting after sending her the written proposal and before she told him to proceed with the production of the commercials, he admitted that she made no response to that statement. Moreover, subsequent to Warren’s allegedly mentioning to Harris that MA would be obligated to pay the talent-renewal fees, TC sent MA written invoices indicating that the invoices, together, represented the full amount MA would owe for the production of the commercials.
The conduct of TC in sending MA the October 6, 2005, and November 11, 2005, invoices, the conduct of TC in stating in the November 11, 2005, invoice that it represented the “final ” half of the production costs, and MA’s conduct in paying the October 6, 2005, and November 11, 2005, invoices in full indicates that the parties agreed that the October 6, 2005, invoice and the November 11, 2005, invoice together represented the full amount that MA had agreed to pay. Thus, even if the trial court found that Warren had told Harris that MA would be responsible for paying talent-renewal fees, the subsequent conduct of the parties indicates that there was *50 no mutual assent to that putative term of the contract. Consequently, because the trial court’s error in holding that MA was responsible for paying the talent-renewal fees was an error in applying the law to the facts, the ore tenus rule does not cloak that holding with a presumption of correctness. See Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007) (“ ‘[T]he ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ ” (quoting Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005))).
The main opinion asserts that it is reasonable that the invoices would not account for talent-renewal fees because, the main opinion says, (1) the talent-renewal fees would not become payable unless the commercials were aired for more than one year; (2) when the commercials were produced, it was speculative whether the commercials would be aired for more than one year; and (3) the talent agencies were the parties who would ultimately be entitled to the talent-renewal fees. Those three factors might explain why TC did not include a provision obligating MA to pay the talent-renewal fees in the parties’ contract, but they do not support the conclusion that the parties mutually assented to the inclusion of such a provision in their contract.
Accordingly, because there was no conduct by the parties evidencing their mutual assent to the inclusion in their contract of a provision obligating MA to pay the talent-renewal fees, I would (1) hold that the trial court erred in holding that MA was obligated to pay talent-renewal fees over and above the total amount billed to it in the October 6, 2005, and November 11, 2005, invoices, (2) reverse the judgment of the trial court, and (3) remand the cause with instructions for the trial court to enter a judgment in favor of MA. Therefore, I respectfully dissent.[4]

. The record indicates that talent agencies charge "talent-renewal fees” for actors who appear in a commercial because the actors cannot appear in other commercials in the markets where the first commercial is airing until the first commercial ceases airing.

. Nothing herein should be interpreted as expressing an opinion regarding whether the talent agencies may recover the talent-renewal fees from TC.